IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 12, 2002 Session

## LYNN HALL, ET AL. v. MARK BOOKOUT

**Appeal from the Circuit Court for Hamilton County**
**No. 00D182      Samuel H. Payne, Judge**

**FILED MARCH 12, 2002**

**No. E2001-01172-COA-R3-CV**

Lynn and Lillian Hall, the maternal grandparents ("Grandparents") of the minor child ("Child"), filed a Petition for Custody seeking permanent custody of the Child, naming the Child's biological father ("Father"), Mark Bookout, as the defendant. The Grandparents had temporary custody of the Child pursuant to an *ex parte* order. At the close of proof at trial, the Trial Court found that the Father was not unfit. In its Order, however, the Trial Court made no specific finding regarding the risk of substantial harm if the Child was placed in Father's custody. The Trial Court denied the Grandparents' petition but did not order the Child returned to Father's custody by any set date but instead provided only that the "ultimate goal" was for the Child to be returned to Father. Father appeals. We affirm, in part, and modify, in part, and remand.

### Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed, in part, and Modified, in part; Case Remanded.

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Robin L. Miller, Chattanooga, Tennessee, for the Appellant, Mark Bookout.

Gary R. Patrick, Chattanooga, Tennessee, for the Appellees, Lynn and Lillian Hall.

# OPINION

## Background

This is a custody dispute between the biological father and the maternal grandparents of a young girl who is now approximately 13 years old. The Child's Mother died from cervical cancer in April 1999. The Mother worked as an emergency room physician. Father also is a physician. At the time of Mother's death, Mother and Father had been married for 18 years.

In January 2000, the Grandparents obtained a Temporary Order of Custody of the Child and filed a Petition for Custody ("Petition") seeking permanent custody of the Child. As grounds, the Grandparents alleged the Child would suffer substantial harm if left in the custody of Father. The Grandparents also alleged in their Petition that since Mother's death, the Child had been living with them and Father had not contributed financially to the Child's support. As further grounds, the Grandparents alleged Father had not cultivated or attempted to establish a relationship with the Child throughout the Child's life. In their Petition, the Grandparents recounted an incident when Father called the police to assist him in removing the Child from the Grandparents' home. The Grandparents alleged Father did so in an attempt to punish the Child for making a "C" in one class.

The parties apparently attempted to mediate their dispute before Father filed his Answer. This attempt failed, but the parties agreed to see a clinical psychologist, Dr. Ronald L. Wigley. Thereafter, Father filed his Answer to Complaint ("Answer"), in which he denied that substantial harm to the Child would result if he were awarded custody of the Child. Father also denied many of the other allegations contained in the Grandparents' Petition and alleged that the Grandparents had interfered with and undermined his relationship with the Child.

The trial was in September 2000. The trial transcript shows that from Mother's death in April 1999, until the summer of 2000, the Child lived mostly with the Grandparents. Both sides testified that after Mother's funeral in April 1999, Father did not see the Child until late May or early June 1999, when he took the Child on vacation. One of the Grandparents testified that between April 1999, and October 1999, the Child did not stay one night at Father's home. Father testified he allowed the Child to live with the Grandparents after Mother's death because he had to close Mother's medical practice, sell their home, and maintain his own medical practice. The Grandparents testified that at Mother's funeral, Father told the Grandparents the Child should go home with them because the Grandparents' home was the Child's home anyway.

Dr. Wigley testified he met with the parties and the Child for approximately six months. Dr. Wigley recommended the Child live with her Father for 75% of the summer of 2000. The Grandparents testified the Child did not want to go to Father's home but that they encouraged the Child to go and attempt to build a relationship with Father.

The Grandparents testified that even prior to Mother's death, Father and the Child did not have much of a relationship. Due to Mother's long work-hours, the Grandparents frequently

babysat the Child and did so even when Father was off from work. One of the Grandparents and Mother's sister both testified that before Mother's death, Father never expressed an interest in being around the Child. Father, however, testified that prior to Mother's death, he had a good relationship with the Child. Father testified that prior to Mother's death and immediately thereafter, he had no concerns about the Child spending time with the Grandparents. Father became concerned, however, when one of the Grandparents, after Mother's death, told him he could not have the Child because the Child was hers.

The record shows the Child testified *in camera* that she wanted to live with the Grandparents because they always had been there for her. The Child also testified Father did not attempt to comfort or console her about Mother's death. The Child further testified that while staying with her Father since her Mother's death, she saw his "privates" on two occasions. The trial transcript shows the Trial Court, however, stated it was satisfied, after talking with the Child, that these incidents were accidents. The Child also testified she was afraid of Father and that while living with him during the summer of 2000, she found pornographic videos and Viagra in Father's house. The Child further testified that during the summer of 2000, Father drank excessively and removed the lock from her bedroom door. Moreover, the record shows the Child threatened to commit suicide if she were forced to live with Father. Dr. Wigley testified that while threats of suicide always should be taken seriously, he believed the Child was using the threat of suicide in an attempt to get her way, like a child who threatens to hold his breath until turning blue.[1]

Father testified he believed the Grandparents were undermining his relationship with the Child and that the Grandparents had interfered with his visitation with the Child. Father also testified the Grandparents stated Father had killed Mother. The Grandparents testified Father stated Mother essentially had committed suicide. The record shows both statements were made in the presence of the Child. Moreover, Father testified the Child accused him of tampering with Mother's will. Dr. Wigley testified he believed the Child had been made privy to conversations by adults about the Mother's will and other related financial matters.

Dr. Wigley testified it was his opinion that the Child needed to be with her remaining biological parent, Father. Dr. Wigley testified it was his opinion that the Child "will suffer harm if she is not returned to [the Father], long-term harm, maybe not immediate harm. . . ." Dr. Wigley's affidavit containing his opinions was entered into evidence as an exhibit. In his affidavit, Dr. Wigley opined "*there is the likelihood that [the Child] will suffer substantial harm if she is not returned to [the Father]*" and that the Grandparents have undermined Father's authority and position which, if continued, would have long-term, severe, and negative effects upon the Child's and Father's relationship. (emphasis added). Dr. Wigley further testified he found no evidence that anybody in the family abused the Child. Dr. Wigley recommended that the Child maintain her relationship with her Grandparents but that visitation with the Grandparents should not be resumed right away.

---

[1] Dr. Wigley also testified that he discussed the Child's threat of suicide with her. Dr. Wigley testified there was no suicide ideation present, and he found that the Child was not depressed, hopeless or suicidal.

The trial transcript shows that at the close of proof, the Trial Court stated "I find absolutely nothing unfit about [Father]. . . ." The Trial Court also stated that "to force [Father] to take [the Child] screaming and crying out of the courthouse against her will will only do far more damage than your relationship would ever improve" and stated that "[the Child] for the time being [should] remain with the Grandparents. . . ." The Trial Court further stated that "[t]he ultimate goal is and should be the goal that down the pike [the Child] should be returned to custody with [Father]."

In its Order, the Trial Court held as follows:

1.      The Petition for Custody filed by the [Grandparents] seeking permanent custody of [the Child] is hereby denied at the present time; however, [the Child] will remain in the temporary custody of the [Grandparents] at this time; [and]

2.      The parties have agreed upon Alternative Counseling Associates to provide counseling services for [the Child and Father], with the ultimate goal being that [the Child] be returned to the custody of [Father]. . . .

The Trial Court further held, in its Order, that the therapist would set visitation between the Child and Father which would begin as soon as possible. The Trial Court also ordered that the parties agree upon visitation between the Child and her paternal grandparents, and if an agreement could not be reached, the therapist would schedule this visitation.

Father appeals. We affirm, in part, and modify, in part, and remand.

**Discussion**

Father's sole issue on appeal is whether the Trial Court erred in not returning the Child to Father because the Trial Court made no finding that Father was unfit or that there was a threat of substantial harm if the Child was returned to Father.

The Grandparents argue that the Trial Court, by the terms of its Order, implicitly found there was a risk of substantial harm to the Child if the Child was returned immediately to Father's custody. The Grandparents, however, do not appeal the Trial Court's refusal to grant their Petition or the Trial Court's finding contained in the trial transcript that Father was not unfit. The Grandparents also raise an issue regarding whether the Order is a final judgment from which an appeal lies under Tenn. R. App. P. 3.

We first address the Grandparents' issue on appeal regarding whether the Order is a final judgment from which an appeal lies under Tenn. R. Civ. P. 3. In support of their argument, the Grandparents contend that the Order was not intended by the parties or the Trial Court to be an appealable final judgment. The Grandparents point to the Trial Court's failure to return the Child

immediately to Father's custody and its order that the Father and the Child undergo counseling with an ultimate goal of returning custody of the Child to the Father. The Grandparents contend that because of these terms, the Order is not a final judgment and is subject to revision once the Child and the Father receive counseling.

Tenn. R. App. P. 3(a) provides, in pertinent part, as follows:

In civil actions every final judgment entered by a trial court from which an appeal lies to the Supreme Court or the Court of Appeals is appealable as of right. Except as otherwise permitted in Rule 9 and in Rule 54.02 Tennessee Rules of Civil Procedure, if multiple parties or multiple claims for relief are involved in an action, any order that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before entry of a final judgment adjudicating all the claims, rights and liabilities of all parties.

In the Grandparents' Petition, only the question of custody of the Child was at issue. The Trial Court, in its Order, denied the Grandparents' Petition. The sole claim before the Trial Court, that is the custody issue, was adjudicated, and, therefore, we hold the Order is a final judgment from which an appeal lies. Tenn. R. App. P. 3. Accordingly, we find this issue to be without merit. However, if we are in error in holding this to be a final judgment from which an appeal lies, we, exercising our discretion, also will treat this as a Rule 10 interlocutory appeal filed by Father and accepted by this Court.

Next, we address the issue regarding whether the Trial Court made a determination of substantial harm, and, if not, whether the Trial Court erred in not returning the Child to Father's custody. Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Tenn. Rule App. P. 13(d); *Alexander v. Inman,* 974 S.W.2d 689, 692 (Tenn. 1998). A Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn. 1997).

Tennessee courts recognize that our State Constitution provides a right to privacy found at Article I , Section 8. *In re Askew*, 993 S.W.2d 1, 3 (Tenn. 1999) (citing *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992)). Based upon this right to privacy, parents have a constitutional right to care for their children. *Id.* (citing *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993). Our Supreme Court in *Askew* held that:

"In light of this right to privacy, we believe that when no substantial harm threaten's [sic] a child's welfare, the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit."

-5-

*Id.* (quoting *Hawk v. Hawk,* 855 S.W.2d at 577). The United States Constitution's Due Process Clause has also been held to provide and protect parental rights. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982).

In child custody disputes between a biological parent and a non-biological parent, Tennessee courts must apply a two-part inquiry as set forth by our Supreme Court in *In re Askew*, holding as follows:

> [I]n a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

*In re Askew,* 993 S.W.2d at 3-4 (quoting *In re Adoption of Female Child*, 896 S.W.2d 546, 548 (Tenn. 1995) (alterations in original). Accordingly, a court, when faced with such a custody dispute, will not make a best interest inquiry until it first determines that there exists substantial harm if the child is placed in the custody of the biological parent. *Id.*

In a custody dispute between a biological parent and non-biological parent, due to the constitutional protection afforded biological parents, the non-biological parent has the burden of establishing by clear and convincing evidence that the child will be exposed to substantial harm if placed in the custody of the biological parent. *Henderson v. Mabry*, 838 S.W.2d 537, 540 (Tenn. Ct. App. 1992); *Ray v. Ray*, M2000-00895-COA-R3-CV, 2001 Tenn. App. LEXIS 746, at * 18 (Tenn. Ct. App. Oct. 5, 2001), *appl. perm. app. filed 11/30/01*.

On appeal, Father correctly notes the Trial Court made no finding, in its Order, that there was a threat of substantial harm to the Child if the Child is returned to Father. The terms of the Order do not address the issue of substantial harm at all. The trial transcript, however, shows that at the close of proof at trial, the Trial Court expressly found that the Father was not unfit. Whether a biological parent is unfit has been used by our Supreme Court in determining whether the child would be exposed to substantial harm if custody were placed with the biological parent. *In re Askew*, 993 S.W.2d at 4; *Hawk v. Hawk*, 855 S.W.2d 573, 581 (Tenn. 1993). We hold that the Trial Court's finding that Father was not unfit, coupled with the Trial Court's denial of the Grandparents' Petition, amounted to a finding that the Child would not be at risk of substantial harm if placed in Father's custody. *See Dean v. Compton*, No. M1998-00052-COA-R3-CV, 2000 Tenn. App. LEXIS 195, at * 41-42 (Tenn. Ct. App. Mar. 30, 2000), *no appl. perm. app. filed*, (holding that while "the trial court did not use the terms 'unfit' and 'substantial harm,' it is clear [from the trial court's oral ruling] . . . that the trial court concluded . . . an award of custody [to the biological mother] would result in substantial harm"). Moreover, the proof contained in the record on appeal does not preponderate against this determination. *See* Tenn. R. App. P. 13(d); *Alexander v. Inman,* 974 S.W.2d at 692. Dr. Wigley testified it was his opinion that the Child would suffer harm if not returned to Father's custody, and Dr. Wigley's affidavit contained his opinion that substantial harm

would result if the Child was not returned to the Father. Consequently, the Grandparents' argument on appeal that the Trial Court's failure to return custody of the Child to the Father was an implicit finding of substantial harm fails. We affirm the Trial Court's denial of the Grandparents' Petition.

We next review the Trial Court's failure to return the Child immediately to Father's custody. Despite the Trial Court's determination that Father was not unfit and its denial of the Grandparents' Petition, the Trial Court did not immediately return custody of the Child to Father or set a date certain for the Child to be returned to Father's custody. We acknowledge the Trial Court was attempting to accomplish a smooth transition for all parties involved, especially the Child. Nevertheless, in light of Father's constitutional rights as the Child's biological parent, the absence of any finding by the Trial Court of substantial harm to the Child if she is returned to Father, and the Trial Court's finding at trial that the Father, in fact, was not unfit, we hold it was error to prolong indefinitely the return of the Child to Father's custody. Simply put, in this contest between Father and Grandparents, Father cannot be deprived of custody of the Child since there has been no finding by the Trial Court of substantial harm to the Child if the Child is returned to Father's custody. *In re Askew*, 993 S.W.2d at 3-4. Therefore, we modify the Trial Court's judgment by granting Father custody of the Child by a specific date. Because of the passage of time since the Trial Court's Order, we hold that while the Child shall be returned to the Father's custody by a date certain, this transfer must be done in a manner to lessen, as much as possible, any negative impact upon the Child. Therefore, this matter is remanded to the Trial Court with instructions that the Trial Court shall by order, after further hearing before the Trial Court if the Trial Court deems it appropriate, institute a plan returning the Child to Father's permanent custody no later than the end of her regular school year of 2001-2002.

## Conclusion

We affirm the portion of the Trial Court's judgment denying Appellees' Petition for Custody but modify the Trial Court's judgment to the extent it failed to grant custody of the Child by a date certain to the Father, Mark Bookout. This cause is remanded to the Trial Court to provide for an orderly transfer of custody to the Father no later than the end of the Child's regular school year of 2001-2002, and for such further proceedings as may be required, if any, consistent with this Opinion and collection of the costs below. The costs on appeal are assessed against the Appellees, Lynn and Lillian Hall.

_____
D. MICHAEL SWINEY, JUDGE