# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 7, 2003 Session

## JOSEPH NEIL NOLEN v. AMY JAY NOLEN

### Appeal from the Chancery Court for Hickman County
### No. 01-260C    Donald P. Harris, Judge

_____

### No. M2002-00138-COA-R3-CV - Filed August 5, 2003

_____

This appeal arises from the trial court's decision to award custody of the parties' minor children to third party custodians.  After finding each parent unfit, the chancellor awarded custody of the daughter to the mother's aunt and the son was awarded to an unrelated third party.  Parenting time was established every first and second weekend with the third party custodians having the third weekend.  Holiday parenting time was also included.  Most importantly the siblings were reunited during these times with their parents.  Both parties were ordered to split the child support obligation owed to the third parties. The father filed this appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

DON ASH, SJ delivered the opinion of the court, in which BEN H. CANTRELL, PJ, MS, joined and WILLIAM B. CAIN, J, concurring.

Irene R. Haude, Nashville, Tennessee, for the appellant, Joseph Neil Nolen.

Douglas Thompson Bates, III, Centerville, Tennessee, for the appellee, Amy Jay Nolen and Third Party Custodian, Jeannie LaCasse.

Ronald Kilgore, Nashville, Tennessee for appellee, LaDonna Miller, Third Party Custodian.

### OPINION

### I.

### Background

Joseph Neil Nolen ("Father") and Amy Jay Nolen ("Mother") were married

February 14, 1998 after a dating relationship which began the previous fall. The parties

married when Father was seventeen years old and Mother was eighteen. They have two children, Alexcia Renea ("Lexie") born March 21, 1998 and Steven Eugene ("Neil") born July 14, 1999. Throughout the relationship, the young family moved from place to place, mostly relying upon family to supply a place to live. Initially, they lived in a trailer in Burns, Tennessee. During this time, the Father worked during the day and the Mother was responsible for Neil's care with the assistance of the Father's sisters, Jessie and Jackie.

In late summer 1998 the family moved in with the Mother's parents. This turned out to be an unpleasant experience for everyone. Eventually, the Nolen's moved out around Neil's birth in July 1999 and moved in with Father's parents.

The Nolen's stayed with Father's parents until around mid-summer 2000. At that time, they moved to a trailer located on Father's grandparent's property. During the majority of the year 2000, Father worked nights and Mother worked days. For the most part, Neil spent time with LaDonna Miller and Jessie kept Lexie. This general pattern continued into early 2001.

In May 2001, Father began an adulterous relationship with Shandell Hillyard. Soon after the Nolen's separated. Around the same time Father, Shandel, and her daughter moved in with Father's parents, Tina and Jeffery Nolen. The Nolens also had Father's two sisters living with them in a four- bedroom house. During this period, Father stayed with Shandel leaving Neil with LaDonna Miller and Lexie with his sister Jessie rather than exercising his parenting time. Shandel continued living at the Nolen's home until shortly before the trial in this action in November 2001.

In the summer of 2001, Mother and Jessie engaged in various activities, including troubling sexual conduct and illegal drug use. This period was repeatedly referred to as the "dark summer." Mother and Jessie had numerous sexual partners during this time period. On occasions, Mother has no recollection of what happened to her children due to her use of Prozac and hallucinations from her use of Xanax. She and Jessie drank alcohol and smoked marijuana. The girls had visitor's traveling to and from the trailer into early morning hours while keeping the children. The children were exposed to R-rated horror movies. Mother's paramours visited the trailer with the children present. She engaged in adulterous sexual relations while the children were in the trailer. Jessie brought her boyfriends into the trailer as well, one of which was a convicted felon.

In September 2001, Mother, Jessie, and Lexie visited Mother's grandmother for lunch. After talking around the table for a few hours, Mother became angry when it was suggested Mother not reconcile with Father. She threatened to take the children to Indiana where her uncle lived. Grandmother pleaded with her not to take the children to Indiana and away from her support system. Grandmother also said "Somebody will take your kids away from you." Mother replied she would become a "psychopathic mother" and "kill my kids and myself" and stormed out of the house with Jessie.

Father filed a pro se Temporary Restraining Order petition in Juvenile Court on September 28, 2001.[1] Mother filed a divorce complaint on October 10, 2001 alleging inappropriate marital conduct and irreconcilable differences. Father responded by filing an Answer, Affirmative Defenses and Counterclaim on October 19, 2001 alleging

---

[1] The exact disposition of this filing is unclear in the record. In his opening statement, Mother's attorney stated Father filed a "pro se petition." Father later testified he filed a Petition for a Temporary Restraining Order in Juvenile Court. Apparently, however, the Juvenile Court transferred the proceedings to the divorce court under T.C.A. § 37-1-103(c). *See also Toms v. Toms*, 98 S.W.3d 140, 144 (Tenn. 2003).

justifiable cause and claiming irreconcilable difference, adultery, and inappropriate marital conduct. In this document, Father requested primary custody of the children citing Mother's activities during the "dark summer." The divorce was heard on November 5, 2001 and the Chancellor found joint grounds for divorce. Furthermore, the Chancellor found neither parent to be a fit parent and awarded permanent legal guardianship of Neil to LaDonna Miller and permanent legal guardianship of Lexie to Jeannie LaCasse. Father filed his Notice of Appeal on January 11, 2002.

## II.

### STANDARD OF REVIEW

Removing custody from both biological parents is a serious matter involving constitutionally protected rights. Our standard of review reflects the hesitancy to invoke such action. Our review is *de novo* upon the record and we presume the trial court's findings of fact were correct, unless the evidence preponderates otherwise. Tenn. Rule App. P. 13(d); *Alexander v. Inman*, 974 S.W.2d 689, 692 (Tenn. 1998). The trial court's legal conclusions are reviewed *de novo* with no presumption of correctness. *Ganzenvoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

## III.

### RESPONSIBILITY FOR PARENTING THE CHILDREN

### A.

Tennessee courts recognize our State Constitution provides a right to privacy found at Article I, Section 8. *In re Askew*, 993 S.W.2d 1, 3 (Tenn. 1999) (citing *Davis v. Davis* 842 S.W.2d 558 (Tenn. 1992)). Based upon this right to privacy, parents have a

constitutional right to care for their children. *Hawk v. Hawk*, 855 S.W.2d 573, 570 (Tenn. 1993).

In child custody disputes between a biological parent and a non-biological parent, Tennessee courts must apply a two-part inquiry as set forth by our Supreme Court in *In re Askew*, holding as follows:

> [I]n a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

*In re Askew*, 993 S.W.2d at 3-4 (quoting *Bond v. McKenzie*, 896 S.W.2d 546, 548 (Tenn. 1995). Accordingly, a court, when faced with such a custody dispute will not make a best interest inquiry until it first determines there exists substantial harm if the child is placed in the custody of the biological parent. *Ray v. Ray*, 83 S.W.2d 726 (Tenn. Ct. App. 2001).

Neither the Tennessee General Assembly nor the courts have precisely defined what circumstances pose a risk of substantial harm to a child. *Id at 726*. Common sense and judicial experience are therefore appropriate processors of evidence in determining what acts are a "real danger or hazard" and what acts are "minor, trivial, or insignificant." *Id.* at 732. Our Supreme Court has used the unfit parent standard in determining if a child would be exposed to substantial harm if parenting time were placed with the biological parent. *See In re Askew*, 993 S.W.2d 1 (Tenn. 1999) (third party custody may not be awarded without showing biological parent unfit, child was dependent and neglected, or substantial danger of harm to child existed); *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn. 1993) (finding absent showing substantial danger of harm to

child, fit parents may not lose parental right to care for child by judicial order). In *Ray*, this court stated:

> The courts cannot award custody to a third party instead of a biological parent unless the third party can demonstrate that the child will be exposed to substantial harm if custody is awarded to the biological parent. In other words, a biological parent cannot be denied custody unless he or she is found to be unfit.

*Ray*, 83 S.W.3d at 732; *see also Hall v. Bookout*, 87 S.W.3d 80, 86 (Tenn. Ct. App. 2002) (holding coupling the lack of a finding of unfitness and denying third party's custody petition "amounted to" a finding of no risk of substantial harm).

An indication of the importance of the court's evidentiary determination is the standard of proof required to establish the biological parent's unfitness. In a custody dispute between a biological parent and a non-biological parent, the biological parent's unfitness must be established by clear and convincing evidence. *Bookout*, 87 S.W.3d at 86. Our Supreme Court repeatedly emphasizes the biological parent's constitutionally protected interest in raising their children free from unwarranted state intervention. *See Doe v. Sundquist*, 2 S.W.3d 919 (Tenn. 1999); *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999). The decision to remove a child from the biological parents is one that should be carefully and seriously examined.

**B.**

**WAS THE TRIAL COURT'S DETERMINATION OF PARENTAL UNFITNESS ERROR?**

Without question, the trial court found both parents unfit to raise the two children. In making this determination, the trial court stated, "I don't think I've ever had a case that gives me more concern about children." The trial court made findings of fact regarding each parent respectively. We examine each in turn below.

## 1. Mother's Unfitness

The trial court clearly found Mother was unfit to care for her two minor children. On appeal, Mother does not contest the trial court's determination of her unfitness. Rather, Mother argues against Father's fitness. We do not disagree with the trial court's determination. Mother's conduct during the time period described as the "dark summer" displays her unfitness. We affirm.

## 2. Father's Unfitness

The trial court gave the following reasons for finding Father unfit: (1) moving his lover and her child into his parent's already crowded home; (2) allowing his sister Jessie to continue to care for the children during and after her actions during the "dark summer;" and (3) failing to adequately establish a stable plan for caring for the children.

First, Father argues the court violated his constitutional right to rear his children by finding Father unfit and awarding the children to separate third parties. Father argues the trial court lacked a factual foundation for its unfitness finding. In support, he argues once he became aware of Mother's conduct, he petitioned Juvenile Court for temporary custody. The record clearly reflects facts to the contrary.

During "dark summer" Father was aware of Mother and Jessie's activities in the trailer. He knew Mother endangered the children with her drug abuse, her abusive language, and her "boyfriends." He did nothing until September with the exception of occasionally voicing his opposition. When questioned about his reaction to Mother and Jessie's activities, Father stated, "I didn't care what Amy and them was doing." Rather

than spend time with Neil, he sent Neil to LaDonna Miller's house. On at least seven occasions, Father deferred staying with his children in favor of staying with Shandel. His decisions clearly demonstrated a clear disregard of parental responsibilities. [2]

Finally, Father argues he has a specific plan for caring for the children. We can find no evidence Father has taken any meaningful steps to develop a substantial relationship with his children or accept responsibility for their care and custody. *See Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). At trial, Father had just been terminated from his job and his brief on appeal does not indicate he is currently employed. He planned to live with his parents, whose home was still crowded with his siblings and he had made virtually no effort to secure his own home. Father continued to allow Jessie to baby-sit Neil and Lexie even after her actions during the "dark summer." Although he argued he wished to reduce LaDonna Miller's time with Neil, he continued up until trial to allow her to keep Neil for extended periods of time. Mrs. Tina Nolen encouraged her daughter-in-law to get a boyfriend to make her son jealous and return to his family. Finally, testimony indicated Mr. Jeffery Nolen drank excessively and had anger management problems. From the record, we agree with the trial court's finding Mr. Nolen unfit. Next, we turn to the trial court's custody determination.

## C.

---

[2] *See Marsh v. Sensabaugh*, No. W2001-000160-COA-R3-JV, 2001 Tenn. App. LEXIS 755 (Oct. 1, 2001) (unreported) (upholding unfitness determination where father regularly failed to exercise visitation privileges, along with other acts).

**WAS IT ERROR TO AWARD PERMANENT CUSTODY TO THIRD PARTIES?**

Once a parent is found by clear and convincing evidence to be unfit, the court must make a custody determination based on what custody arrangement is in the child's best interest. *In re Askew*, 993 S.W.2d 1, 3-4 (Tenn. 1999). The court below took the remarkable step of placing the children in the custody of separate third parties. The Father attacks this determination on two alternative grounds: (1) assuming the Father is unfit, custody should have only temporarily been awarded to another party; or (2) assuming the Father is unfit, the children should not have been separated into the custody of two separate third parties. We will address both issues separately.

**1.**

As an alternative argument, Father argues even if both parents are unfit, the trial court should have only temporarily removed custody from the parents. In support, Father cites two of our decisions, *Hall v. Bookout*, 87 S.W.3d 80 (Tenn. Ct. App. 2002) and *Henderson v. Mabry*, 838 S.W.2d 537 (Tenn. Ct. App. 1992), as precedent for the proposition that even if a parent is unfit the court should order only temporary custody to a third party. Presumably, temporary loss of custody will allow the unfit parent time to become fit. A careful review of both cited cases reveals neither case supports such an argument.

*Henderson* and *Hall* are factually distinct from the present case because in both cases the trial court did not find the biological parent unfit or pose a substantial danger of harm to the child. Furthermore, in both cases, "exigent circumstances" existed justifying temporary custody in a third party rather than with the biological parent. The "exigent circumstances" in each case was that the biological mother had died. In *Henderson*, this

court explicitly conditioned returning the child to the biological parent on two conditions: (1) "so long as he is a fit custodian" and (2) "when the present exigent circumstances no longer require custody in another." *Id.* at 540-541. In *Bookout*, this court held it was error for the trial court to "prolong indefinitely the return of the child to Father's custody" by awarding temporary custody to the paternal grandparents where the court made no finding of unfitness or of substantial harm regarding the biological father. *Bookout*, 87 S.W.3d at 86.

Simply put, the trial court did not provide for the children to be returned to either parent because the trial court viewed them as unfit to provide a stable, nurturing, and loving environment for the children. We do not find Father's arguments persuasive.

**2.**

Next, Father argues even if parents unfit, the children should not have been separated. Initially, we note keeping siblings together is generally preferred. *See Baggett v. Baggett*, 512 S.W.2d 292, 293-294 (Tenn. Ct. App. 1973). Nevertheless, the overriding concern is the welfare and best interests of the children. *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999).

The trial court sought to preserve whatever stability and familiarity had developed in these children's lives. Mrs. Miller provided the stable, nurturing, and traditional family environment for Neil he did not receive with his parents or close relatives. Mrs. Miller works at a special education pre-school and is a foster parent. Additionally, she is married and has three teenage daughters. Neil had developed a significant relationship with LaDonna Miller. The record is clear Neil referred to Mrs. Miller as "mom" and Mr.

- 10 -

Miller "dad." Neil spent a significant amount of time with Mrs. Miller, even staying with her for almost an entire summer.

With respect to Jeannie LaCasse, the court's reasoning is less clear but it seems apparent however the trial court sought to establish some stability and preserve some continuity of placement for Lexie. Although Mrs. LaCasse did not have the long-standing, established relationship with Lexie compared to LaDonna Miller's relationship with Neil, Mrs. LaCasse had kept Lexie on several occasions. The trial court also formulated a parenting plan allowing the siblings visitation together during parenting times with Mother and Father.

In assessing the court's custody determination, it is important to recognize trial courts have broad discretion in fashioning custody arrangements designed to suit the unique circumstances presented in individual cases. *Id. at 563*. Our role as an appellate court is not that of a "Monday morning quarterback." Rather, we must assess if the trial court's decision overstepped the boundaries of a reasonable application of the law to the facts presented. *See Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001). We find the facts in the record do not support reversal of the trial court's decision to separate the children.

**III.**

The trial court's decision regarding the biological parents unfitness is affirmed. The trial court is also affirmed regarding the issue of placing the children in separate homes. Costs are taxed to the appellant.

_____
DON R. ASH, SPECIAL JUDGE

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 7, 2003 Session

## JOSEPH NEIL NOLEN v. AMY JAY NOLEN

**Appeal from the Chancery Court for Hickman County**
**No. 01-260C    Donald P. Harris, Judge**

_____

**No. M2002-00138-COA-R3-CV - Filed August 5, 2003**

_____

WILLIAM B. CAIN, J., concurring.

For reasons articulated in *Estate of Acuff v. O'Linger*, 56 S.W.3d 527 (Tenn.Ct.App. 2001)(application to appeal denied) and in *In re: Z.J.S. and M.J.P.*, 2003 WL 21266854 (Tenn.Ct.App. June 3, 2003)(Cain, Judge, concurring), I cannot agree that T.R.A.P. 13(d) provides the proper standard of review in cases where the finder of fact is required to determine upon "clear, cogent and convincing evidence" that the controlling facts are "highly probable." In such cases, tried non-jury, an appellate court must independently review the evidence and determine whether "clear, cogent and convincing evidence establishes that such facts are "highly probable." Such is the standard of review that was used in *Estate of Acuff* wherein this Court held that a "clear and convincing evidence" standard is incompatible and irreconcilable with a "preponderance of the evidence" standard.

Since the evidence in this case reviewed under the "clear and convincing evidence" standard applied in *Estate of Acuff* clearly establishes the facts as found by the trial court to be "highly probable," I concur in the judgment.

_____
WILLIAM B. CAIN, JUDGE