IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2004 Session

## MINNA E. H. EVANS v. STEVEN WINTROW ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 99-1259-I     Irvin H. Kilcrease, Jr., Chancellor**

_____

**No. M2003-00788-COA-R3-CV  - Filed September 30, 2005**

_____

This appeal arises from a dispute between an investor and the owners of several failed business ventures.  The investor filed suit in the Chancery Court for Davidson County against her erstwhile business colleagues seeking to recover damages for breach of contract and conversion.  A jury awarded the investor $86,691.82 in compensatory damages and $40,000.00 in punitive damages.  One of the defendants appealed.  We have determined that the judgment must be reversed because of inconsistencies in the jury's verdict caused by ambiguous special interrogatories.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and FRANK G. CLEMENT, JR., JJ., joined.

Joel H. Moseley, Sr., Nashville, Tennessee, for the appellant, Robert S. Jernigan.

Fletcher W. Long and Martin A. Kooperman, Nashville, Tennessee, for the appellee, Minna E. H. Evans.

**OPINION**

**I.**

Robert S. Jernigan and Steven D. Wintrow were two of the three owners of a closely held corporation called Investment Brokers of America, Inc. ("Investment Brokers").  Investment Brokers was doing business as "Money Source Loan and Pawn."  Messrs. Jernigan and Wintrow desired to obtain additional working capital to expand their business, and in January 1998, they approached Minna E. H. Evans with a proposal to invest in their business.  After Messrs. Jernigan and Wintrow represented that the current worth of Money Source Loan and Pawn was over $600,000, Ms. Evans agreed to invest in the venture.

On January 9, 1998, Messrs. Jernigan and Wintrow and Ms. Evans signed a written agreement.  This agreement provided that Ms. Evans would be entitled to one third of the business's "total assets" in return for her contribution of property at 3225 Town Village Road in Antioch,

Tennessee and her agreement to use her personal credit to assist Investment Brokers in obtaining a $150,000 line of credit. The agreement also recited that the purposes of the venture were, among other things, to (1) clear the Money Source Loan and Pawn's existing line of credit, (2) establish a new bail bonding company in Davidson County, (3) establish a new private investigation service, and (4) purchase equipment to start a voice mail service.

Ms. Evans sold her Antioch property in May 1998 for $78,706.53 and deposited $72,208.97 into a joint account with Mr. Jernigan. According to Ms. Evans, none of the business ventures identified in the January 9, 1998 agreement were established, and Messrs. Jernigan and Wintrow refused to pay over her share of Money Source Loan and Pawn's profits.

On April 30, 1999, Ms. Evans filed suit against Messrs. Jernigan and Wintrow[1] in the Chancery Court for Davidson County seeking actual and punitive damages for breach of contract and conversion. As best as we can tell from the appellate record, Ms. Evans was able to serve only Mr. Jernigan with process. Mr. Jernigan filed an answer denying the existence of a contract and liability under any other theory.

Ms. Evans failed to pursue her claims against Mr. Jernigan or to respond to his discovery requests. Accordingly, on May 11, 2000, the trial court dismissed her complaint for failure to prosecute. Almost three months later, on August 1, 2000, Ms. Evans filed a Tenn. R. App. P. 60.02 motion seeking to set aside the order of dismissal. On August 31, 2000, the trial court granted Ms. Evans's motion and set aside the dismissal based on the excusable neglect of her lawyers.[2]

Thereafter, Ms. Evans pursued her case against Mr. Jernigan. On the morning of September 30, 2002, when the trial was about to begin, Ms. Evans's lawyer discovered that Mr. Wintrow was present in court in response to a subpoena issued by Mr. Jernigan. With the trial court's permission, Ms. Evans's lawyer served Mr. Wintrow with process, and the trial court observed that Mr. Wintrow was "a defendant in this case." Mr. Wintrow requested a continuance because he had just been served and was unrepresented. When Ms. Evans's lawyer stated that he was prepared to proceed against Mr. Jernigan alone, Mr. Jernigan's lawyer objected to "bifurcating" the trial because the parties were "so interwoven" and because trying Ms. Evans's claims against Mr. Wintrow separately would prevent Mr. Jernigan from asserting comparative fault against Mr. Wintrow with regard to the conversion claim.[3] The trial court eventually decided to sever Ms. Evans's claims against Mr. Jernigan from her claims against Mr. Wintrow and to proceed to trial on her claims against Mr. Jernigan.

---

[1] Ms. Evans also named Jeffrey Stockwell, the purchaser of Ms. Evans's property, as a defendant but later voluntarily dismissed her claims against him on the day of trial.

[2] Mr. Jernigan attempted to appeal the order reinstating the case, but this court dismissed the appeal on the ground that the trial court's August 31, 2000 order was not a final, appealable order. *Evans v. Wintrow*, No. M2000-02830-COA-R3-CV (Order, Tenn. Ct. App. Nov. 29, 2000).

[3] Mr. Wintrow eventually retained the lawyer who was representing Mr. Jernigan to represent him. Apparently, Messrs. Jernigan and Wintrow do not have conflicting positions. The record, such as it is, does not contain any indication that Mr. Jernigan has attempted to assert a cross claim against Mr. Wintrow.

Following a five-day trial, the jury awarded Ms. Evans $10,000.00 in damages for breach of contract and $76,691.82 in damages for conversion, as well as $40,000.00 in punitive damages. Ms. Evans filed a late motion requesting prejudgment interest, and Mr. Jernigan filed a motion for new trial. The trial court denied both motions on February 20, 2003, and Mr. Jernigan has appealed.

## II.
### THE FINALITY OF THE FEBRUARY 20, 2003 JUDGMENT

At the outset, we must address an issue regarding the justiciability of this case. Parties are entitled to appeals of right under Tenn. R. App. P. 3(a) only from final orders. Under any other circumstance, they are not entitled to appellate review unless they obtain discretionary review in accordance with Tenn. R. App. P. 9 or 10. There is a substantial question regarding whether the February 20, 2003 judgment is final for the purposes of Tenn. R. App. P. 3(a).

A final judgment is primarily one that fully adjudicates all the claims between all the parties. Tenn. R. App. P. 3(a); *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983); *Aetna Cas. & Sur. Co. v. Miller*, 491 S.W.2d 85, 86 (Tenn. 1973); *Wilson v. Wilson*, 58 S.W.3d 718, 725 (Tenn. Ct. App. 2001). It leaves nothing else for the trial court to resolve. *In re Estate of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003); *Vineyard v. Vineyard*, 26 Tenn. App. 232, 241, 170 S.W.2d 917, 920 (1942). Until a judgment becomes final, it remains within the trial court's control and may be modified anytime prior to the entry of a final judgment. *Stidham v. Fickle Heirs*, 643 S.W.2d 324, 328 (Tenn. 1982); *Eldridge v. Eldridge*, 137 S.W.3d 1, 20 n.10 (Tenn. Ct. App. 2002); *Hall v. Bookout*, 87 S.W.3d 80, 85 (Tenn. Ct. App. 2002).

A judgment that does not resolve all the claims between all the parties may nevertheless be considered a final judgment if the trial court certifies it as final in accordance with Tenn. R. Civ. P. 54.02. A judgment that completely resolves one of multiple claims or that completely resolves all the claims against one of multiple parties is eligible for certification under Tenn. R. Civ. P. 54.02. *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 558 (Tenn. 1990); *Town of Collierville v. Norfolk Southern Ry.*, 1 S.W.3d 68, 70 (Tenn. Ct. App. 1998). However, finality arises only when the trial court has expressly directed the entry of a final judgment because no just reason for delaying the entry of a final judgment exists.

Neither the trial court's December 13, 2002 judgment order nor its February 20, 2003 order denying Mr. Jernigan's post-trial motions are final orders because they do not resolve all the claims between all the parties and because they do not contain the certification required by Tenn. R. Civ. P. 54.02 designating them as final. At the time these orders were entered, Ms. Evans's claims against Mr. Wintrow were still outstanding.

Normally, the lack of a final order would cause us to dismiss the appeal without prejudice and remand the case for the entry of a final order. However, we have the power pursuant to Tenn. R. App. P. 2 to suspend Tenn. R. App. P. 3 for good cause, including the expedition of an appellate decision. *Bayberry Assocs. v. Jones*, 783 S.W.2d at 559. While we are reluctant to suspend the rules to consider an order or judgment that is not final, we have determined that it is appropriate for us to do so in this case in light of our disposition of this appeal on its merits.

## III.
### TENN. R. CIV. P. 60.02 RELIEF FROM THE DISMISSAL FOR FAILURE TO PROSECUTE

Mr. Jernigan first takes issue with the trial court's decision to grant Ms. Evans relief under Tenn. R. Civ. P. 60.02(1) from the order dismissing her complaint for failure to prosecute. Specifically, he asserts that the failure of one of Ms. Evans's lawyers to make arrangements to review his mail during an extended absence from his office was not the sort of excusable neglect that warrants relief pursuant to Tenn. R. Civ. P. 60.02. Even though we might have reached a different result, we decline to second-guess the trial court's decision to grant Ms. Evans Tenn. R. Civ. P. 60.02 relief.

### A.

A dismissal for failure to prosecute is analogous to a default judgment. Therefore, when considering whether a dismissal for failure to prosecute should be vacated, Tennessee courts borrow the analysis used in determining whether a default judgment should be vacated under Tenn. R. Civ. P. 60.02.[4] *Henry v. Goins*, 104 S.W.3d 475, 481 (Tenn. 2003). That analysis involves examining (1) whether the plaintiff willfully disregarded the time limits and failed to respond to the court's notices; (2) whether the plaintiff had a meritorious claim at the time of dismissal; and (3) whether the defendants would be prejudiced if relief were granted. *Henry v. Goins*, 104 S.W.3d at 481.

Default judgments and dismissals based on procedural grounds like failure to prosecute run counter to the judicial system's general objective of disposing of cases on the merits. *See Childress v. Bennett*, 816 S.W.2d 314, 316 (Tenn. 1991) (noting that courts are reluctant to give effect to procedural rules that prevent a litigant from having a claim adjudicated on its merits). Default judgments and dismissals for failure to prosecute are drastic sanctions, and neither are favored by the courts. *Henry v. Goins*, 104 S.W.3d at 481. For this reason, courts construe requests for relief pursuant to Tenn. R. Civ. P. 60.02 much more liberally in cases involving default judgments and dismissals than in cases following a trial on the merits. *Henry v. Goins*, 104 S.W.3d at 481. As the Tennessee Supreme Court has noted, "[t]here is much more reason for liberality in reopening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits." *Tenn. Dep't of Human Servs. v. Barbee*, 689 S.W.2d 863, 866 (Tenn. 1985) (*quoting* 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2857, at 160 (1973)).

Decisions to grant relief from a default judgment or dismissal for failure to prosecute are discretionary. *Tenn. Dep't of Human Servs. v. Barbee*, 689 S.W.2d at 866. Accordingly, appellate courts are not free to substitute their judgment for the trial courts, *Henry v. Goins*, 104 S.W.3d at 479, and are permitted to reverse a trial court's discretionary decision only when the trial court applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the

---

[4]Rule 55.02 of the Tennessee Rules of Civil Procedure permits trial courts to set aside default judgments in accordance with Rule 60.02.

complaining party. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

**B.**

Ms. Evans's excusable neglect claim is based on her lawyers' failure to respond to the court's notices. Lack of notice may provide a basis for granting a party relief from the entry of a default judgment or dismissal for failure to prosecute. *Henry v. Goins*, 104 S.W.3d at 480. Accordingly, our task is to determine whether the trial court properly found that Ms. Evans's lawyers' neglect was excusable under the facts of this case.

Ms. Evans was represented by two Nashville lawyers, Fletcher W. Long and Martin A. Kooperman. When Messrs. Long and Kooperman filed Ms. Evans's complaint, they were both associated with the firm of Duzane, Kooperman & Mondelli.[5] Even though both lawyers were counsel of record, the trial court clerk apparently addressed all notices and other correspondence to Mr. Long only.

For some unspecified period in late 1999 through August 2000, Mr. Long was "involved" in a medical malpractice case in Alabama that required him to be away from his office for extended periods of time. According to Mr. Long, he was unable to make arrangements with anyone else at Duzane, Kooperman & Mondelli to review his mail while he was gone. Accordingly, when the letter containing the notice of the impending dismissal for failure to prosecute arrived, Mr. Long did not attend to it because he was out of town, and Mr. Kooperman was not aware of it because the letter was not addressed to him.

Mr. Kooperman assumed that the trial court clerk would mail notices to him because he was also Ms. Evans's counsel of record. He also assumed that he would receive notices because he had requested Mr. Jernigan's lawyer to correspond directly with him because of Mr. Long's prolonged absences from the office, and Mr. Jernigan's lawyer had expressly agreed to "contact Mr. Kooperman concerning the case as opposed to addressing correspondence only to Mr. Long."

The Tennessee Supreme Court has decided that in cases of this sort, a lawyer's oversight or inattention may qualify as "excusable neglect" under Tenn. R. Civ. P. 60.02(1) as along as the conduct is not "willful." *Henry v. Goins*, 104 S.W.3d at 481 (directing the courts to consider "whether the default was willful"). While the court's adoption of the "willfulness" standard appears to have softened the plain language of Tenn. R. Civ. P. 60.02(1), we, as intermediate appellate judges, are obliged to follow the directives of the Tennessee Supreme Court, particularly after the "court has given definite expression to its views in a case after careful consideration." *Holder v. Tenn. Judicial Selection Comm'n*, 937 S.W.2d 877, 881 (Tenn. 1996).

---

[5]In late October or early November 2001, Mr. Long ended his affiliation with Duzane, Kooperman & Mondelli and began practicing on his own. However, Messrs. Long and Kooperman continued to represent Ms. Evans.

A review of the record in light of the three *Henry v. Goins* factors militates against finding that the trial court improperly granted Tenn. R. Civ. P. 60.02(1) relief in this case. Insofar as the first factor is concerned, while it would be appropriate to characterize the conduct of Ms. Evans's lawyers as sloppy and careless, it would be inappropriate to characterize it as willful. With regard to the second factor, it is plain, based on the jury's verdict alone, that Ms. Evans has a meritorious complaint. Finally, Mr. Jernigan has not come forward with any explanation of specific prejudice, other than the prejudice of being required to defend himself in court. This sort of prejudice does not provide a basis for denying Tenn. R. Civ. P. 60.02(1) relief in cases of this sort. *Henry v. Goins*, 104 S.W.3d at 482.[6]

## IV.
### THE INCONSISTENCIES IN THE JURY'S VERDICT

Mr. Jernigan also takes issue with the inconsistencies in the jury's verdict reflected in its answers to several of the special interrogatories. Specifically, he insists that the jury failed to follow the instructions in the special interrogatories regarding the breach of contract claim and that the jury provided fatally inconsistent answers relating to the conversion claim. We agree that the jury failed to follow the instructions and provided inconsistent answers.

## A.
### The Adequacy of the Special Interrogatories

We would do a disservice to the jury in this case if we did not begin with a comment regarding the special interrogatories that they were provided to guide their deliberations and to present their verdict. There is little doubt that the inconsistencies in the verdict were caused, not by the jurors' inattention or lack of diligence, but rather by the obviously inadequate special interrogatories provided to them. The parties have not, and indeed cannot, challenge the adequacy of these interrogatories because, as far as this record shows, they participated in their preparation and approved submitting them to the jury.[7] However, we are convinced that if the jury went astray, it was led astray by the special interrogatories they were provided.

---

[6]Mr. Jernigan also insists that the local rules of court prevented reinstating Ms. Evans's complaint. Rule 18.01 of the Local Rules of Practice for the Circuit, Chancery, Criminal, and Probate Courts for Davidson County, Twentieth Judicial District of Tennessee states that "[a]ll civil cases must be concluded or an order setting the case for trial obtained within twelve (12) months from the date of filing . . . ." However, Rule 1.03 explicitly allows judges to deviate from the local rules "in the exceptional cases where justice so requires." In light of its decision to reinstate the case to its docket, we do not consider the trial court's decision to waive Rule 18.01 to be erroneous.

[7]In the absence of a miscarriage of justice, this court will not permit a party who has acquiesced the use of special interrogatories or a special verdict form to vitiate an unfavorable verdict because the interrogatories or verdict form were insufficient. *Reinhart v. Knight*, No. M2001-02195-COA-R3-CV, 2003 WL 22964302, at *3 (Tenn. Ct. App. Dec. 4, 2003), *perm. app. denied* (Tenn. May 10, 2004); *Williams v. Van Hersh*, 578 S.W.2d 373, 376 (Tenn. Ct. App. 1978). Mr. Jernigan has not provided a transcript of the trial containing the discussions between the trial court and the lawyers regarding the special interrogatories or the trial court's jury instructions. Since Mr. Jernigan had the duty to provide the record needed to address the issues he sought to raise on appeal, Tenn. R. App. P. 24(a), we will presume that the portions of the record Mr. Jernigan failed to provide would not have supported a claim that he had objected to the special interrogatories that were submitted to the jury.

The purpose of special interrogatories, like a trial court's jury instructions, is to provide the jury with legal guidance for its deliberations. Tenn. R. Civ. P. 49 gives a trial court great latitude in preparing and using special verdict forms and special interrogatories. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 910 (Tenn. 1999). However, when a court decides to use a special verdict form or special interrogatories, it is required to make sure that its instructions and the special interrogatories or special verdict form, when considered together, present the contested legal issues to the jury in an unclouded way. *Ingram v. Earthman*, 993 S.W.2d 611, 640 (Tenn. Ct. App. 1998).

Prior to the beginning of the trial on September 30, 2002, both Ms. Evans and Mr. Jernigan submitted proposed special interrogatories to the trial court. Ms. Evans proposed thirteen questions, and Mr. Jernigan proposed four. Based on these drafts, the trial court prepared ten special interrogatories of its own. Five of the interrogatories were based on interrogatories Ms. Evans had proposed, and five were based on interrogatories proposed by Mr. Jernigan. Regrettably, the ten special interrogatories actually submitted to the jury were duplicative, ambiguous, and contained elements of claims that had either not been pled or had not been tried by consent. Rather than aiding the jury in its deliberations, these interrogatories could only have obfuscated the issues for the jury to decide.

**B.**
**The Breach of Contract Claim**

The first special interrogatory addressed Ms. Evans's breach of contract claim and was patterned after the special interrogatory submitted by Mr. Jernigan. As answered by the jury, this interrogatory appeared as follows:

1.      Was there a contract involving Ms. Evans and Mr. Jernigan?
         __X__ YES           _____ NO

[If you answered "NO", then go to Question #2. Otherwise, proceed to answer questions A- B.]

A.      If there was a contract involving Ms. Evans and Mr. Jernigan, was the contract dated (select one):
        __X__ January 9, 1998
        _____ December 31, 1997

B.      If Mr. Jernigan was a party to a contract with Ms. Evans, did either Mr. Jernigan or Ms. Evans breach the contract?

        Did Mr. Jernigan breach the contract?
              __X__ YES           _____ NO

        Did Ms. Evans breach the contract?
              __X__ YES           _____ NO

[If you answered either "YES" or "NO" as to both Mr. Jernigan and Ms. Evans, or if you answered "NO" as to Mr. Jernigan, then go to Question #2.  Otherwise, proceed to answer the following questions.]

       i.      Did Ms. Evans suffer any damages as a result of Mr. Jernigan's breaching the contract?
            _X_ YES       _____ NO

       ii.     If Ms. Evans suffered damages as a result of Mr. Jernigan's breach, what is the amount of those damages?
            $ _10,000.00_

Question 1(B) asked the jury whether either Mr. Jernigan or Ms. Evans breached the January 9, 1998 contract and instructed the jury to skip the remaining questions regarding breach of contract damages if it answered Question 1(B) either "yes" or "no" with regard to both parties.  The jury responded that both Mr. Jernigan and Ms. Evans had breached the January 9, 1998 contract and, contrary to the explicit instructions following Question 1(B), answered the damages question by stating that Ms. Evans had sustained $10,000 in damages as a result of Mr. Jernigan's breach.

The record, such as it is, contains no ready explanation for the jury's failure to follow the instructions in the special interrogatories, and Ms. Evans offers no explanation in her brief.  In the trial court, she argued that the jury's answers to Question 1 reflect its application of the principle that a party who breaches a contract is not liable for damages if the other contracting party breached first.[8]  While this may very well be the case, there is nothing in the record to support this explanation.  It is certainly not reflected in the special interrogatories, and without a transcript, it is impossible to determine which party breached first or even whether the jury instructions contained this principle of law.  Accordingly, we have no choice other than to conclude that the jury's answer to Question 1(B) is invalid.

## C.
### The Conversion Claim

Both of the parties suggested special interrogatories regarding Ms. Evans's conversion claim.  Rather than selecting one of the interrogatories or preparing its own, the trial court included both questions in the special interrogatories submitted to the jury.  Accordingly, Question 3 asked "Did Mr. Jernigan use Ms. Evans' [sic] money as if it was his own in denial of Ms. Evans' [sic] use of the money."[9]  Then in Question 7, the trial court asked "Did Mr. Jernigan violate the relationship with

---

[8]A more accurate statement of the principle is that a party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of same agreement.  *United Brake Sys., Inc. v. Am. Envt'l Protection, Inc.*, 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997); *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990).

[9]This interrogatory was submitted by Mr. Jernigan.

Ms. Evans by using the money for his own gain to Ms. Evans' [sic] exclusion?"[10] The jury answered "NO" to Question 3 and "YES" to Question 7.

The trial court would have been well-advised to disregard both of these proposed questions and to fashion a clearer question based on the definition of "conversion" in T.P.I. 3 – Civil 8.65. The jury's answers to Questions 3 and 7 cannot be reconciled, and based on their inconsistency, there is no way to determine reliably whether the jury concluded that Mr. Jernigan had exercised dominion or control over Ms. Evans's property without her consent or inconsistent with her claim of title. Faced with these incongruent answers, we cannot reliably conclude that the jury found that Mr. Jernigan had converted Ms. Evans's money.

Litigants are entitled to have their rights settled by a consistent and intelligible verdict. Thus, when a judgment is based on an inconsistent verdict, the appellate courts have no choice other than to reverse the judgment and order a new trial. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d at 911. The jury's verdict in this case contains just the sort of irresolvable inconsistencies that undermine a jury's verdict. Accordingly, we conclude that the judgment must be reversed and that the case be remanded for a new trial.

## V.

The judgment is reversed, and the case is remanded to the trial court for a new trial.[11] We tax the costs of this appeal in equal proportions to Robert S. Jernigan and his surety and to Minna E. H. Evans for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.

---

[10] This interrogatory was submitted by Ms. Evans.

[11] The parties have raised three other issues that need not be addressed in light of our decision to grant Mr. Jernigan a new trial. Ms. Evans may remedy her tardy request for prejudgment interest on remand, and Mr. Jernigan's complaint about severing Ms. Evans's claims against Mr. Wintrow will be remedied by the fact that Ms. Evans will now litigate her claims against Messrs. Jernigan and Wintrow in the same proceeding. Likewise, Mr. Jernigan's assertion that the jury failed to reduce Ms. Evans's damages by ten percent is moot because we have reversed the judgment.