IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
APRIL 20, 2010 Session

# IN THE MATTER OF SHELBY R. AND SYDNEE R.

### Direct Appeal from the Chancery Court for Dyer County
### No. 04C353     Tony A. Childress, Chancellor

### No. W2009-01172-COA-R3-CV - Filed May 18, 2010

This appeal involves a custody dispute between a father and maternal grandparents. The father and grandparents initially filed a joint petition to remove custody from the children's mother. When the father later filed a separate amended petition for custody on his own, the grandparents argued that he should be precluded from seeking custody due to a previous mediation agreement. The father argued that he was entitled to assert his superior parental right to custody against the grandparents. The trial court found the mediation agreement enforceable and did not consider the father's petition for custody. The father appeals. We vacate the trial court's order and remand for further proceedings.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Vacated, Reversed and Remanded

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Vanedda Prince Webb, Dyersburg, Tennessee, for the appellant, Richard Edward Rogers

Damon E. Campbell, Union City, Tennessee, for the appellees, Charlie Ozment and Donna Ozment

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Richard Rogers ("Father") and Amy Ozment Rogers ("Mother") married in 2001 and subsequently had two daughters, Shelby and Sydnee. In 2005, Father and Mother were divorced by the chancery court in Dyer County. At the time, Shelby was three years old and Sydnee was two. The final decree of divorce provided that the parties had agreed to "joint shared custody of the children with the wife being designated as the primary residential custodian and husband being designated as the alternate residential custodian[.]" Although the parenting plan did not specifically state which days the children would reside with Father, the child support worksheet attached to the parenting plan reflects that Father had 96 days of parenting time with the children, which is slightly more than standard visitation for an alternate residential parent. *See* Tenn. Comp. R. & Regs. 1240-2-4-.04(7)(a) (stating that the Guidelines presume that children will typically reside with the alternate residential parent 80 days per year).

After the divorce, Mother and the children resided in Dyersburg, Tennessee, and the children attended school there. Father moved to Cordova, Tennessee, but he continued to exercise his visitation with the children. In late 2007, Mother and the children moved into the home of Mother's parents, Charlie and Donna Ozment ("Grandparents"), who also lived in Dyersburg. Grandparents discovered that Mother had a drug problem, and Mother checked into a rehabilitation program, leaving the children with Grandparents. However, Mother left the program prior to completing it and "went missing." Grandfather then contacted Father and informed him of the situation. Grandfather had already contacted an attorney, and Father agreed to join with Grandparents in filing a joint petition to have custody removed from Mother.

On November 29, 2007, Father and Grandparents jointly filed a "Petition for Emergency Custody Order and Change of Custody" in the chancery court of Dyer County. They alleged that Mother was under the influence of drugs, including methamphetamine, that she had not visited the children in over one month or otherwise contacted them in over two weeks, and that her current whereabouts were unknown. The petition stated that the children were "in need of an order legally and immediately providing the Petitioner, [Father,] and Joint Petitioners, [Grandparents] with custody of the minor children throughout the pendency of this matter." The petition further stated that it was in the children's best interest for "immediate temporary protective custody" to be awarded to Grandparents, with Father

receiving standard visitation in addition to other visitation as agreed by the parties.[1] Finally, the petition requested that permanent custody be removed from Mother and that a parenting plan be entered "awarding Joint Petitioners joint custody" of the children. In support of the petition, Father and Grandfather both submitted affidavits describing the situation with Mother and stating that temporary emergency custody should be awarded to Father and Grandparents.

The chancery court entered an ex parte "Emergency Custody Order" removing custody from Mother and placing "temporary care and custody" with Grandparents with Father having visitation rights. Father and Grandparents were given authority to make certain decisions for the children. Following a hearing, on December 12, 2007, the chancery court entered an order extending the emergency custody order, stating that joint custody was awarded to Father and Grandparents pending a final hearing, with Grandparents serving as primary residential caregivers and Father having visitation.

On April 22, 2008, a consent order was entered, providing that the parties would schedule the case for mediation within 45 days. A mediation conference was held on May 6, 2008, at which Mother appeared with her attorney, and Father and Grandparents appeared and were represented by Attorney Jason Creasy. All parties ultimately signed a "Mediation Agreement," which provided that Grandparents would "retain custody of the minor children" and that "[Father's] visitation and parenting responsibility" would remain as set forth in the previous parenting plan. Mother was allowed supervised visitation with the children under strict guidelines. The Mediation Agreement concluded with the following provision:

> The parties agree to review the visitation arrangement in this case 120 days from May 11, 2008, by either filing an appropriate petition with the Court or returning to mediation.

Following the mediation, Attorney Creasy, who represented Father and Grandparents during the mediation, sent a proposed consent order to Father for him to sign. However, Father refused to sign the consent order because, according to Father, its provisions differed from his understanding of the agreement that was reached at mediation.[2] After retaining his

_____

[1] According to Father, he wanted the children to reside with Grandparents temporarily so that they could finish the school year at their current school in Dyer County, but Grandparents were aware of the fact that he intended to pursue custody after the school year ended.

[2] The proposed consent order does not appear to be in the record on appeal. However, Father testified that the proposed order "stated that [Grandparents] would become the parents of Sydnee and Shelby." Father said, "That wasn't what I got from the mediation as to what was going to happen. . . . It
(continued...)

own attorney, on June 17, 2008, Father filed a "Motion to Amend Petition," in which he sought to amend the joint petition for custody that he had filed with Grandparents and file a separate "Amended Petition for Change of Custody" on his own. The trial court granted Father's motion to amend. Father's amended petition alleged that a material change in circumstances had arisen since the final decree of divorce such that it was in the children's best interest for the parenting plan to be modified. Father noted Mother's drug use and also claimed that her new husband had violent tendencies that rendered her home unsafe for the children. Father requested that he be named primary residential parent, claiming that he was a fit and proper person to have custody and that he was capable of providing a safe, stable, and loving home for them. Father argued that, as the children's father, he had "a right superior to the [Grandparents] in regard to the custody of the minor children." He submitted a proposed parenting plan that named him primary residential parent, provided that Mother would have supervised visitation, and allowed Grandparents overnight visitation every other Saturday.

Grandparents filed a response to Father's amended petition, in which they denied that Father had rights superior to theirs. They asserted that the parties had previously resolved all of the issues in this case during mediation, and they argued that "all parties are bound by the terms of the Mediation Agreement." Grandparents asked the court to dismiss Father's petition and enforce the Mediation Agreement.

The trial court entered an order on December 10, 2008, stating that it would bifurcate the proceedings. The order states that a separate hearing would be conducted regarding the enforceability of the mediation agreement prior to scheduling the final hearing regarding modification of the court's prior orders.

At the hearing before the trial court, Father testified that he agreed to file the joint petition with Grandparents, requesting that all three petitioners share temporary custody, in order to allow the children to finish the school year in Dyer County. He explained that Grandparents lived about fifteen minutes away from the children's school, while Father lived in Cordova. Father testified that he "understood it to be a temporary thing from day one," and that Grandparents and their attorney knew that Father intended to pursue custody after the school year ended. Father testified that Grandfather selected Attorney Creasy to represent them and that Grandfather paid for Attorney Creasy's services. Father said it was his understanding that Attorney Creasy would only represent him if he and Grandparents were "on the same page." Father testified that he asked Attorney Creasy whether obtaining the

[2](...continued)
scared me." At oral argument, Father's counsel explained that Father was concerned about the consent order's reference to Grandparents as "primary residential parents."

temporary custody order would "cause me a problem as far as getting custody of my children," and according to Father, Attorney Creasy told him that he could do whatever he wanted to do. Attorney Creasy testified as well[3] and conceded that Father had discussed wanting custody "on the front end" of the representation. He said that he told Father, "in generalities," that it would not be a problem as long as he and Grandparents were "still on the same page."

Father testified that he went into the mediation conference believing that the parties would only be addressing the guidelines for Mother's supervised visitation, and that toward the end of the mediation, the issue of permanent custody arose in the context of a discussion of obtaining insurance for the children. Father said that he again had questions about whether it would "cause a problem for me to get the kids if we did this," and that Attorney Creasy then suggested that he leave the room and allow Father and Grandfather to discuss the issue. Father said that Grandfather told him that if an agreement was not reached that day, then Mother could very easily get the children back. Father said he told Grandfather, "Well, I need to know about me getting my kids," and Grandfather said that Father would just have to trust him. Father admitted that Attorney Creasy used the term "material change in circumstance," but Father said that he did not understand what that meant at the time. Father said he understood that as long as Grandparents were in agreement with him "getting the kids," it would not be a problem. Father said that he was under the impression that he would "have no problem whatsoever getting my kids when school was out." Father said he did not know that he could have requested that the Mediation Agreement simply provide that the children would reside with him after the school year ended.

Attorney Creasy acknowledged that during the conference, Father stated, "Well, maybe I just should have custody of these chidren." Attorney Creasy said that he responded by saying, "Whoa. Hold on a second. Now I'm in conflict central here, because if you're wanting custody and he's wanting custody, y'all aren't on the same page anymore." Attorney Creasy testified that Father then stated, "Well, when we first agreed to this in the joint petition, I asked you, Mr. Creasy, was this going to impact my ability to have my children in the future." According to Attorney Creasy, he then acknowledged the previous discussion with Father and reiterated that he had told Father, "As long as you and [Grandparents] are on the same page and as long as they're agreeing with it, it's not going to cause you an extra obstacle. If y'all aren't on the same page, it will cause you an extra obstacle in the future." Attorney Creasy testified that Father then became "a little bit upset." Attorney Creasy acknowledged that Father expressed concern that he might not want to go through with the mediation. Attorney Creasy said he explained to Father that the consequence of having *an order entered* granting custody to Grandparents would be that he would have to show a

---

[3] Grandparents were represented by a different attorney at the hearing.

material change in circumstances. Attorney Creasy testified that he informed the parties and the mediator that he thought that a conflict of interest had arisen and that the mediation should be terminated. According to Attorney Creasy, Grandfather and Father then asked if they could have a few minutes alone to talk, and after ten to fifteen minutes in another room, they returned crying and said they were still on the same page. Attorney Creasy said that Father then agreed for Grandfather "to get custody." At the hearing, Grandparents' current counsel asked Attorney Creasy:

Q.    If I follow your testimony correctly, on two occasions on the day of mediation, you specifically discussed with [Father] the fact that signing an agreement giving [Grandparents] custody could present an obstacle for him later in obtaining custody of his children if they were not in agreement?

A.    I want to be careful in the way I word it. I know – I don't know that I said "signing the agreement." I said – and this is kind of a technical answer – I told him that the entry of an order giving them custody would mean that he would have to just come back and show a material change in circumstances. . . .

Attorney Creasy also testified about sending the proposed consent order to Father for his signature after the mediation, which Father refused to sign. Attorney Creasy said again that "in all fairness" to Father, he did tell Father that the "material change in circumstances" issue would arise after the entry of an order, rather than after the signing of an agreement.

Following the hearing, the trial court concluded that the Mediation Agreement was an enforceable contract and that its provisions were in the children's best interest. Father filed a "Motion for Additional Findings," claiming that the trial court should hold a separate hearing in order to consider additional evidence regarding the children's best interest[4] and also determine whether the terms of the Mediation Agreement should be adopted by the court in an order. The trial court denied Father's motion, stating that it had already conducted a best interest analysis. Father timely filed a notice of appeal.

## II.  ISSUES PRESENTED

Father presents the following issues, slightly reworded, for review on appeal:

---

[4] Very few facts relevant to the children's best interest were presented at the hearing. During the hearing, the trial judge stated on three separate occasions that the purpose of the hearing was limited to deciding whether the Mediation Agreement was enforceable. The judge specifically stated, "we're not getting into the custody portion of this case."

1.    Whether the trial court erred by enforcing the mediation agreement despite Father's fundamental constitutional rights as a parent;

2.    Whether the trial court erred in denying Father's motion for additional findings seeking a hearing regarding the children's best interest.

For the following reasons, we reverse the decision of the chancery court and remand for further proceedings.

## III.    DISCUSSION

### A.    *The Superior Parental Rights Doctrine*

The standard applied to custody disputes between parents and non-parents is very different from the standard applied to disputes involving two parents. *In re R.D.H.*, No. M2006-00837-COA-R3-JV, 2007 WL 2403352, at *6 (Tenn. Ct. App. W.S. Aug. 22, 2007). "The comparative fitness analysis commonly associated with custody disputes between biological parents cannot be used because it fails to take into account that the custody claims of biological parents and the custody claims of third parties do not have the same legal weight." *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). It is well-settled that the Tennessee Constitution protects a natural parent's fundamental right to have the care and custody of his or her children. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002) (citing *Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993)). Parental rights are superior to the rights of others and continue without interruption unless a parent consents to relinquish them, abandons the child, or forfeits parental rights by conduct that substantially harms the child. *Id.* (citing *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995)).

Due to these rights, courts deciding initial custody disputes must give natural parents a presumption of "superior parental rights" regarding the custody of their children. *Blair*, 77 S.W.3d at 141 (citing *In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999)). This means that in an initial custody dispute involving a parent and a non-parent, a natural parent may only be deprived of custody of a child upon a showing of substantial harm to the child. *In re Adoption of Female Child*, 896 S.W.2d 546, 548 (Tenn. 1995). Specifically, the non-parent has the burden of establishing by clear and convincing evidence that the child will be exposed to substantial harm if placed in the custody of the parent. *Ray*, 83 S.W.3d at 732-33; *see also* *Hall v. Bookout*, 87 S.W.3d 80, 86 (Tenn. Ct. App. 2002). Only after a clear showing of substantial harm may the court engage in a general "best interest of the child" analysis. *In re Adoption of Female Child*, 896 S.W.2d at 548. It follows then, that in an initial custody dispute, if a court awards custody to a non-parent over a parent's objection, the original custody order must contain the requisite finding of substantial harm, or else it is

invalid and unenforceable. *See **In re Askew***, 993 S.W.2d 1, 5 (Tenn. 1999); ***Baker v. Smith***, No. W2004-02867-COA-R3-JV, 2005 WL 1848477, at \*9 (Tenn. Ct. App. Aug. 5, 2005).

A different standard may apply, however, when a natural parent seeks to modify an existing court order awarding custody to a non-parent. ***In re R.D.H.***, 2007 WL 2403352, at \*7. In ***Blair v. Badenhope***, the Tennessee Supreme Court determined that nothing in our Constitution demands that a parent be allowed to assert "superior parental rights" to custody when a valid court order properly transferred custody from that parent in the first instance. *Blair*, 77 S.W.3d at 143. This reasoning applies even if the parent voluntarily ceded custody to the non-parent when the original custody order was entered. *Id.* The Court held that, absent certain extraordinary circumstances, a natural parent cannot invoke the doctrine of superior parental rights to modify a valid order of custody. *Id.* at 141. Instead, the parent must show that a "material change in circumstances" has occurred, which makes a change in custody in the child's best interest. *Id.* at 139.

Thus, the ***Blair*** Court held that a natural parent enjoys the presumption of superior rights under four circumstances:

(1)     when no order exists that transfers custody from the natural parent;
(2)     when the order transferring custody from the natural parent is accomplished by fraud or without notice to the parent;
(3)     when the order transferring custody from the natural parent is invalid on its face; and
(4)     when the natural parent cedes only temporary and informal custody to the non-parents.

*Blair*, 77 S.W.3d at 143. When any of these circumstances are present in a given case, then protection of the natural parent's right to have the care and custody their child demands that they be accorded a presumption of superior parental rights against claims of custody by non-parents. *Id.* In addition, the Court noted that if the parent had voluntarily relinquished custody to a non-parent when the original order was entered, the parent must have had "knowledge of the consequences of that decision" in order for that action to operate as a waiver of superior parental rights. *Id.* at 147 n.3.

In the case before us, the trial court had before it Father's petition for a change in custody, in which he sought to assert his superior parental rights, and also Grandparents' petition for a change in custody. The custody order that was in effect at that time, entered on December 12, 2007, awarded joint custody to Father and Grandparents pending a final hearing, with Grandparents serving as primary residential caregivers and Father having visitation. Thus, Grandparents had only been awarded temporary joint custody of the

children.  According to *Blair*, 77 S.W.3d at 148, a natural parent is entitled to invoke the doctrine of superior parental rights when "the order grants only temporary custody to the non-parents."

Nevertheless, Grandparents argue that Father waived his superior parental rights by entering into the Mediation Agreement that provided that they would retain custody of the children.  As previously stated, the "superior parental rights" presumption recognizes that "parental rights are superior to the rights of others and continue without interruption unless a biological parent *consents to relinquish them*, abandons his or her child, or forfeits his or her parental rights by some conduct that substantially harms the child."  *Blair*, 77 S.W.3d at 141 (emphasis added).  Thus, "a parent's 'voluntary transfer of custody to a non-parent, *with knowledge of the consequences of that transfer*,'" will defeat the parent's claim to superior rights of custody.  *In re Adoption of A.M.H.*, 215 S.W.3d 793, 811 (Tenn. 2007) (quoting *Blair*, 77 S.W.3d at 147).  However, "a parent's voluntary relinquishment of custody must be made with knowledge of the consequences of that decision." *Blair*, 77 S.W.3d at 148 n.3. In addition, the change of custody deemed consented to cannot be temporary.  *In re B.C.W.*, No. M2007-00168-COA-R3-JV, 2008 WL 450616, at *4 (Tenn. Ct. App. Feb. 19, 2008).

Because the Mediation Agreement only provided that Grandparents would "retain" custody, with Father maintaining his rights under the parenting plan, it appears that Grandparents and Father would have continued to share joint custody under the plain language of the Mediation Agreement.[5]  Moreover, the Mediation Agreement apparently had a somewhat limited effect, as it specifically provided that the parties agreed "to review the visitation arrangement in this case 120 days from May 11, 2008, by either filing an appropriate petition with the Court or returning to mediation."  Attorney Creasy testified that his advice to Father centered around the legal ramifications of *an order being entered*, rather than the consequences of signing a mediation agreement.  Considering these facts in addition to Father's testimony that he did not understand Attorney's Creasy's explanation and believed that he would have no problem obtaining custody when the school year ended, it is our opinion that Father did not knowingly waive his superior parental rights by signing the Mediation Agreement.[6]

---

[5]  Again, prior to the Mediation Agreement, Father and Grandparents were sharing joint custody of the children pursuant to the temporary order.  In addition, pursuant to the final decree of divorce, Father and Mother had "joint shared custody of the children with the wife being designated as the primary residential custodian and husband being designated as the alternate residential custodian[.]"

[6]  We note that certain members of this Court disagree as to which party bears the burden of proving a voluntary relinquishment with knowledge of the consequences of that decision and the standard of proof required.  *See Sharp v. Stevenson*, No. W2009-00096-COA-R3-CV, 2010 WL 786006 (Tenn. Ct. App. Mar.
(continued...)

Grandparents also argue that the Mediation Agreement is enforceable as a simple contract. In **Blair**, the Court stated that "the presence of a valid court order awarding custody" of the child to the non-parent was "critical to the proper resolution of the issues" before it. **Id.** at 144. "Of course, where an initial order does not exist," the Court stated, "the Constitution requires a court to apply the superior rights doctrine." **Id.** at 146. When no order exists that transfers custody from the natural parent, the natural parent enjoys the presumption of superior rights. **Id.** at 143. Because no order was entered confirming or approving the arrangement set forth in the Mediation Agreement, Father is not precluded from asserting the superior parental rights doctrine.

## IV. CONCLUSION

For the aforementioned reasons, we reverse the decision of the chancery court and remand for further proceedings. The chancery court's order finding the Mediation Agreement enforceable is hereby vacated, and this case is remanded for the trial court to consider the petitions for custody filed by Grandparents and by Father. In those proceedings, Father is entitled to the benefit of the superior parental rights doctrine. The chancery court's previous temporary order of December 12, 2007, shall remain in effect pending further hearing by the chancery court, meaning that joint custody shall remain with Father and Grandparents, with Grandparents serving as primary residential caregivers and Father having visitation. Costs of this appeal are taxed to the appellees, Charlie and Donna Ozment, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

---

[6](...continued)
10, 2010). However, in this case, sufficient evidence exists under either analysis to convince us that Father did not voluntarily relinquish his superior parental rights.

-10-